18-1116 Paul Harcz Jr. v. Brody Boucher Oral argument 15 minutes for plaintiffs, 15 minutes to be shared by the defendants May it please the Court, my clients are five blind men ages 70, 64, 60, 58 and 31 who cannot navigate without white canes. A 35 year old woman who cannot walk and uses a wheeled cart to support her body and her husband. These are the people the defendants singled out and barred from entering a celebration of the Americans with Disabilities Act that was free and open to the public and that was being held on the grounds of the Michigan State Capitol, a classic traditional public forum. Why isn't this a time, place and manner restriction? A permissible one? Yes, Your Honor. First of all, there was no permit that was being enforced. There was no general rule that applied to everyone showing up at the Capitol that day. For example, there was not a rule that you could not leaflet within the event or hold signs within the event. This was a decision made solely as to my clients based on the content of their speech. That is not a permissible time, place and manner restriction. Even if there had been some content neutral rule that the Michigan State police were considering applying, it would still need to meet the requirements of the First Amendment case law. Namely, for even a content neutral exclusion, that exclusion would need to be narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication. Here, there was no significant government interest ever identified by anyone. Well, it's disruption of the event. Is that not the event of the interest? It is not, Your Honor, and that's very important here. The district court and the defendants labeled my clients protesters. The defendants spoke about need to prevent disruption. That is a characterization being placed on my clients that is not accurate. In the complaint, what we pled is that they showed up that day because they are people with disabilities who had a deep interest in the subject matter. They had some signs. They had some leaflets. They did not intend to create a disturbance, and there was no information that anyone had to the contrary. May we consider the video as part of your pleading? You may, Your Honor. Does the video not show there was yelling from your clients? The video shows a partial snapshot of the day. The videos go on for hours. What the defendants have focused on is about 15 minutes of the video that picks up after the police have already barred my clients from entering the event. There is no video of everything leading up to that, including that morning when my clients were gathered on the sidewalk simply standing there chatting, and the police come up to them and say, Are you planning to enter the ADA event? And they say, Yes, we are. And the police tell them, You may not come in. And they enter a dialogue. They say, Why not? What have we done? And the police say, This is a private event. We don't want a disturbance. My clients answer them. They say, We have no intent of creating a disturbance. We're just here to come to the event. Your client was one of the sponsors, was he not, or one of the originators? One of the organizers of the event, yes. Mr. Hartz was on the accommodations committee. Once the police take the position that you can't enter, there are about 15 minutes where my clients are very upset, and they are saying things like, Let us in, let us in, and shame on you. There are also interludes in that where they are trying to reason with the police officers and say, You understand you can't do this. You understand the irony here. This is an event about access. All we want is to go in and talk with people, to go to the booths, to hear the speeches, and we will not create a disturbance. There are also many hours after Mr. Hartz is arrested where the video shows they're simply standing there. Remember, too, I represent seven people. Not all of them were yelling. Not all of them were saying anything. There's one man who simply stands there holding his sign. He's blind. He can't see what's happening, and they don't let him in either. Do each of them have an individual claim? I thought it was just Hartz. They do all have individual claims under the First Amendment. Yeah, but I mean with regard to getting arrested. Only Mr. Hartz. Right. He made the decision. He knew his rights. He even cites 42 United States Code. There you go. That's your fault. He knew his rights, Your Honor, and he said, This is not right. I am allowed to enter an event that's free and open to the public. And imagine for a moment the scenario that he's in. He can't see the police officers. He is completely blind. They have formed a wall in front of him with their bodies. They have erected metal barricades. All he has is his white cane and his voice, and they will not speak to him. They do not speak to him to tell him where they are. And so he is tapping. What do they tell him? What does he know? They tell him, You cannot disrupt the event. That's what they say to him. And when he persists and says, I'm going in, they yank him across the barricade and they arrest him, and he was not resisting arrest. They drag him through the Michigan State Capitol. Was he carrying a sign? He was not. Mr. Hartz had his white cane. He was wearing an ADA 25th anniversary celebration T-shirt. He was one of the organizers of the event. He had a backpack, and he had leaflets. Do you think that what the police should have done is just let them all in, and what if they got in and then disrupted the event and in there and yelled and hollered and put the sign up in the face of the speaker? Would they have any restrictions that were legal? The answer is yes, the police should have let them in. This is something that has come up time and again in the case law and in real life. And yes, if at the time that they were in the event they were creating a disturbance, if they were gathering around the lectern where the speakers were speaking, drowning out the speakers, blocking people's access, at that point that significant government interest is no longer conjectural. It's no longer speculative. It's a real thing that's happening. Again, this is not— If you would, Ms. Porter, how the distance from the event where your clients were positioned, how far from the—could they have disrupted the event from where they stood? Were they in a position? Again, Your Honor, I suppose it— Let's say that they were—if they were intent on disrupting, they could have done it from where they were or made themselves heard? Yes. The reason I'm struggling a little is what does that mean to disrupt? My clients pose no physical threat to anyone. If we think using our voices and speaking loudly is sufficient to disrupt— Drown out the other purpose that was organized that day. They would not have been able to do that from where they were left, behind the Austin Blair statue, nor were they allowed to interact with anyone inside the event. There were booths in the event. There was food in the event, restrooms. They were kept on the outside of all of that. The case law in the circuit for many years has been clear that's not okay. Holding somebody, making them stand behind a booth, relegating them to the sidewalk, putting them outside a permitted area, that's not acceptable. A First Amendment right—and this is something that the Supreme Court made clear over 80 years ago, the United States Supreme Court—if you have a right to speech somewhere, the fact that you can exercise it somewhere else is not sufficient. There have to be clear, articulable reasons that still are weighed against the strong First Amendment right for expression. How far away were they restricted? About 150 feet or something like that? Yes, Your Honor. Our complaint alleges that the Austin Blair statue was about 150 feet from the platform that was set up where the speakers were engaged. Both the district court and the defendants made the point, well, they're within earshot of the event or they're not that far from the back row of the event. Again, that's not good enough. Being held outside the event was significant for my clients. They wanted to participate in the event. They wanted to walk around and talk with people. They wanted to go to the booths that were set up on various topics. They wanted to eat that day and use the restroom. Again, if there were a history of violence by my clients, if they had engaged in some sort of conduct that made clear that there was going to be imminent danger to anyone, or even Your Honor's example, that they were telling him, let us in, we are going to drown out this whole thing. That's a fact pattern that we would need to walk through and consider, but it's not the fact pattern of what happened that day. It's not even close, not even close. The additional... What about the conspiracy allegations to hold the private actors liable? I'm struggling with, you know, if someone goes to the police and says, we think somebody might be about to do something unlawful, is that enough for there to be a conspiracy? The answer is no, it is not. What else is there besides that point? Yes, Your Honor. We did a pre-filing investigation in this case, and we learned that there was more here than just a simple tip to the police or I have a concern about this. What did you say in your complaint, though, about that? We said in our complaint that after that initial call, there was a series of discussions, even a meeting between the state police and the private event organizers the morning of the event, where they sat down and they reached an agreement and created a plan to keep the organizers out of the complaint. It was much more than a tip. I reserve my time. Thank you very much. Thank you. Will you all divide your time? How is this going to happen? Five minutes apiece, Your Honor. Morning, Your Honors. Assistant Attorney General John Fedenski, I'm here on behalf of the individual state defendants. The district court did not err in its qualified immunity analysis. There is sufficient daylight between what the First Amendment case law says about time, place, manner restrictions and what actually occurred here at the Capitol. I think the panel's questions about disruption and distance and the rights of the folks who have the microphone are important to consider. What about Ms. Porter's suggestion that let's see if it happened and then take action? Well, one fact that was left out of the recitation of facts is that a bullhorn was also among the items that were brought by that group. Is that in the complaint, though? No, it's in footnote three of the court district court's opinion and it's plainly evident in the video and the video is referenced in the complaint. So it's fair game under Rule 12. And I think Judge Quist down below said you don't have to wait for the actual disruption to occur to put out a prophylactic measure like a human barrier or a metal barrier, which is precisely what happened in this case. And so this isn't a case that's analogous to cases where there's a threat of a trespass citation or a threat of a disorderly conduct citation or an order to leave the Capitol grounds. Was this event a private event? No, well, it was privately organized, privately sponsored, but open to the public. What about the allegations in the complaint where they say that Sergeant Held said the ADA celebration was a private event? Doesn't that take this out of the time, place, and manner restriction category? You have a private event. To me, that indicates you're excluding the plaintiffs from the event. That's not a time, place, and manner restriction. You're excluding them altogether. Well, I think we can take well-pleaded factual allegations, but we can't take legal conclusions at face value. Exclusion is a legal conclusion, Your Honor, and I think what we have apparent from what developed in the criminal case in the video and also what's implicit and explicit in the allegations is that this group was about 10 feet from the back row of the event. They were within earshot. Sergeant Enriquez testified to that. Not the 150 that we were told? Well, Paragraph 46 says 150, and I think Paragraph 51 or a different one says 130. So you can take the 150. That's fine. Either way, it's not consistent with other case law where individuals are told by police you need to leave. Bible Believers was actually decided after this case, but it provides some useful guidance because the qualified immunity problem in Bible Believers was the order to disperse and the threat of criminal action. Did they say that they wouldn't create any disturbance? Who, the police? No, the people that they, well, the gentleman they arrested, the plaintiff. Well, the plaintiff who charged the barrier certainly created a disturbance. I don't know. And he voiced his intent rather colorfully that he wasn't going to respect the time, place, and manner restriction that the police laid out. And dovetailing into the Fourth Amendment claims, really there's no basis here to conclude that any of those officers didn't have a reasonable basis to believe there's probable cause for resisting and obstructing. And, in fact, the plaintiff was bound over on charges in the state court, and so all the malicious prosecution, the false arrest claims, really ought to go by the wayside. That's based on what's on the video of how he was behaving once he was? Yes, absolutely, Your Honor, and also based on the testimony that came through in the preliminary examination and really the binding determinations as a matter of collateral estoppel by the state court that there was probable cause for these charges. We can consider that as a matter of judicial notice at the motion to dismiss stage? I think you can, Your Honor, and if you look at the complaint, it actually quotes the preliminary exam transcript and it references video. And so what was developed in the criminal case is actually within the four corners of the complaint here, and it can all be done on a Rule 12 basis. As you know, Ms. Porter argues this is not a time, place, and manner restriction, that it qualifies as an absolute bar of her clients. What do you say about that? Well, I say that's an unfounded legal conclusion. I think the record that was developed in the criminal case and even the allegations here that they're by the Blair statue, they're in the thick of the capital grounds, they are within the designated event area as Judge Quist noted in the opinion. A final point I would like for the court to consider is that the state law claims, Judge Quist didn't provide separate analysis on those, but I think the import of the court's determination and the opinion and the judgment that dismissed all the plaintiff's claims make it clear that those state law claims ought to also be rejected and as a matter of state law immunity, any individual claim against my clients ought to be dismissed as well. I see my time's expired. Thank you, Your Honors. Good morning. May it please the Court. Joseph Starp here on behalf of the Appellee Handicapper Advocacy Alliance, Inc. Your Honors, as you know, my client is a private entity that was one of the organizers and it's been brought into this case under a 1983 conspiracy claim only. And it is our position that the appellant has abandoned the Equal Protection Clause claim under the 14th Amendment because it was not brief, so it's just a 1983 conspiracy claim. And as you know, the standard is that a single plan has to exist in order for my client to be brought into this. And it is our position in that the briefing that the appellant has embellished to the pleadings that they submitted in the complaint and that my client in particular was only a participant in two relevant conversations. She expressed concern initially two days before. That's what's pled. And she did not participate in a specific meeting between Ms. Gravetti and the state police, so she was not involved in that. But she did then appear the morning of the event and did meet with Officer Held where she basically made the point that she did not want the protesters to disrupt the event. And that's what she said. She didn't make any type of plan or organize anything where the police would keep them out. She just merely expressed her opinion. And I think as to Judge Bush's point before, which is that it would have a chilling effect, and I think the district court said this, if individuals were prevented from expressing their concerns to the police. It's not like my client actually went and planned this. Did your client tell the police where to put them? Put them 150 feet from the platform or whatever it was? No, and there's no allegation that that is the situation. My client merely furnished information, and merely furnishing information does not meet that standard. There was a plan that was in place by the police to exclude what were labeled as the protesters. Oh, I'm sorry. I wasn't sure when you finished your thought. I was going to ask you to address whether or not the pleading here, given that we're in a 12b-6 procedural situation, whether the pleading here doesn't suffice if we're read in the light most favorable to the plaintiff. Your Honor, I do not believe it does. With regard to the conspiracy. It does not. And I think that's why, in the briefing itself, the appellant paraphrases what's in the complaint, but does not specifically say what is in the complaint. And I think if you look, and we briefed this pretty thoroughly, that the complaint itself talks about the actions that my client, well, Ms. Weaver, who was the former director of my client, it talks about specifically what she said. And as you look at each of these various allegations, and I don't have enough time to go through all of them, it does not amount or rise to the level of conspiring or coming up with a single plan. It does not meet that threshold. Even giving all the benefit of the doubt? Yes. That's the question. Yes, yes. And I think benefit of the doubt is one thing. Taking it to a whole other level where it's asserting facts that are just simply not pled in the complaint takes it to another level. Well, your client did say that if this group, this Road to Freedom bus showed up, she wasn't going to let them park. She was not going to. Yes, according to this. But she didn't tell the police not to do that. The pleading says that she said she would not allow the protesters to park. That's paragraph 40 of the complaint. All right. So I think there's a big distinction there between telling the police or asking the police to participate. Again, there needs to be. 41, she says she's concerned that the protesters would disrupt the event. Sergeant Held assured Gravetti that no one would be permitted to protest at the event. My client is Weaver. That's Gravetti. Oh, I'm sorry. You're Weaver. So that's nothing more about Weaver in the complaint. That's correct. So, anyway, the general point is that there needs to be a meeting of the minds. I think the district court opinion cites to the Starzl case versus City of Philadelphia, quotes that, and I think that that case, even though the- There's an allegation that Sergeant Held told Weaver that the Michigan State Police would not permit protesters to pass beyond the Austin Bear Blair statute. So there is an allegation that she knew that that was the parameter. Well, she was told that by the police. So not quite exactly what you would say. I understand what you said earlier, but she was aware of the parameters. She was made aware by the police. That's correct, Your Honor. My time is up. All right. If you have any questions, I would ask you to affirm. They're chomping at the bit over here. Morning, Judge Cook, Judge Bush, Judge Seiler. My name is Greg Meehan. I represent the Michigan Association of Centers for Independent Living. And, Judge Bush, to go just at your point, your point about that the sergeant had told Gravatt that this is what the plan was for the Michigan State Police is really the only hook one could even think of, a breadcrumb in this case, on a 12b6. But it doesn't meet the conspiracy statute, and it's not sufficient fact. The fact that the police told them that's what was going to be done does not establish, as does Stargate and all the other cases, that there must have been a plan between them. Well, there's a legend and agreement because they ask the policemen that are not to be protesters. It doesn't say that in the complaint. What it says in the complaint is that my client, Griven, went to the police and said, based upon Hardzik being part of the planning commission and based upon him telling the planners that there was going to be a protest, went to the police and indicated that there was a belief that was going to be the case. And then the allegations go to the fact that, and I can read it, Griven told Brocklehurst that she expected there to be protesters at an event. That's not illegal or improper. She's entitled to be able to do that. The part that you referenced. Paragraph 46. Correct. Griven agreed with Sergeant Held that the MC will not permit that, but it was the Michigan State Police that first came to them and said, this is our plan of action, and all my client does is say okay. That sounds like an agreement, doesn't it? Well, my client is a private actor, has no agreement with a state police of what they will or will not do. All my client is is acknowledging that's what he's going to do. That's why the 12B6 works in this case and should be dismissed. What does agreed mean? It means she was told and she said okay. That's not a conspiracy plan, with all due respect, judges. It's simply a human being saying this individual part of the planning told me there's going to be protesters, which, by the way, when you look at the video, a bullhorn is not a cane, it's not a hearing device, it's not a visual device, and I'm not trying to be pejorative. Saying the okay is acknowledgement of what the officer said. Of what's happening. Exactly. Okay. Could it be read as an agreement? No, because if it was an agreement, it should have been said. It should have been said. They agreed and sat down and had a plan of what was to be done. My client has no power over the Michigan State Police of how they effectuate their duties. All she did is make them aware, the sergeant looked at the issue, and, of course, we're here. But, again, let's not lose sight of the fact that Mr. Hartz was part of the committee that created this event. He communicated to these people that it was going to happen. They communicated to the police of what he told them, and the police came up with where this was going to go and simply came to my client and explained what was going to go on, and she said, okay, or I agree, this is fine. But it's not her dictating to the police or them sitting down in a plan. There's no allegation of that. If there were, we wouldn't be here on a 12B6. And then last, I just want to end, because everyone else has spoken about this, you get to look at the video because it's part on the Rule 12. And when you look at the video and you see a bullhorn, when we talk about disruption, it's exactly aligned in there. And you notice you didn't hear that from sister counsel, that one of them showed up with a bullhorn. You don't use a bullhorn to communicate. There's no allegations. And, again, I'm not trying to be funny here. There's no allegations here that people had speech impediments or speech problems or voice problems. They could not project their voice. When people come with a bullhorn, it's the drowned out. It's exactly what was communicated. It was exactly the fear. The police acted in an appropriate manner. And I submit when you look at that video, you will see not somebody being dragged across a barrier. You will see somebody going across the barrier indicating what they intend to do. Lastly, I would just like to end with the same comment that brother counsel made. They have abandoned the equal protection, and I believe the only case before you as it relates to Massel is the 1983 conspiracy. And I would end with the fact that they have to show an agreement to constitute an unlawful language, and they've not alleged any of that in there. And thank you. Thank you, counsel. Ms. Porter. The problem is clear when you listen to counsel's argument that this case was dismissed on a 12B6. There has been no factual development. Many of the facts you just heard from counsel are not correct. They are totally inconsistent with the facts in our complaint. Name the facts that are, I mean, help us with that, because counsel's directing us to the pleadings in the complaint, and the bullhorn is part of the record. Yes, Your Honor. So let me talk about the bullhorn. It is correct that Eleanor Cantor, when she arrived that day, had a bullhorn in her walking cart. She never turned on the bullhorn. When the police pointed out the bullhorn, she said, fine, I won't use the bullhorn. I just want to enter the event. It is not on at all during the video. There's no use of the bullhorn. And certainly there are. Is there part anywhere in the record that her agreement to leave it in the cart or leave it unused? Yes, it's on the video, Your Honor. Oh, she says it on the video. There's extensive discussion on the video where Ms. Cantor is trying to reason with the police. And, yes, there is a discussion about that, and one of the police officers says, I think what he says is I'm going to have to take that bullhorn. I don't think he does take it away from her, but she never uses the bullhorn. She never insists on that. She is conciliatory throughout and trying to reason with the police about the fact that they intend to make no disturbance, that they're happy to comply with that request. It was never used even 150 feet away? It was not, Your Honor. Okay. This notion, let me focus on the agreement. And I think, Your Honor, Judge Bush is focused on an appropriate paragraph, number 46 on the complaint. We do allege agreement. And the idea is the okay to the officer an acknowledgment or an agreement? It is an agreement, Your Honor. Okay. Is that the way one must read it? That is the way the court must read it on a 12B6. And, also, that is not all we allege. We allege that there was a meeting that morning. Do I, standing here before Your Honors, know the entire content of the meeting? Counsel has told you that the plan was presented by the Michigan State Police. We don't know that. There's been no discovery from any of the participants in that meeting as to who said what, where did the idea of the Austin Blair statue come from? Was that from the police? Was that from the organizers of the event? That's something that we are entitled to discover. And one might accuse my complaint of many things, but it is not sparse. It has detail about the events of that day and the reason why we believe that we have sufficiently planned. Are you aware of any relevant case law at the motion to dismiss stage regarding these issues? It seems like most of these cases, if not all of them, are summary judgment cases. That's correct, Your Honor. Qualified immunity, the courts say, should be decided as early in the proceedings as possible, but the motion to dismiss stage is too early. There are significant factual disputes between the parties about what happened. You heard one counsel say that my client, Mr. Hartz, charged the barrier. That is an absurd characterization of what happened. Mr. Hartz is blind. He didn't charge anything. He tapped, tapped, tapped with his white cane to try to find out where the barrier is. The police say to him, you're not going to make a disturbance, and they literally pull him across the barrier. What happened that day is he was not just going away quietly, and that is what happens in most of the cases. The police threaten whoever has shown up with their sign, with their badge, and said, if you don't leave, you're going to be arrested, and most of them back off. Mr. Hartz was angry. He did yell. If you watch the videos, you will see he was very upset by what was happening. He's allowed to be. That is his right. And in terms of saying I am not going to stay behind the barrier, the police had no right to put that there. They did not have a right, as what counsel said, you have to think about the rights of the folks who have the microphone. My client's First Amendment rights are important too, and the case law in this circuit has been clear for years that it is not up to the police to choose. They don't get to say your voice is more important than yours. Just because you have a permit, that means we're going to privilege your voice, particularly in this situation where there's nothing that my clients did to significantly threaten or impede any of the voices that day. Did the state court find there was probable cause to arrest your client? They did, but they did so, we allege. Without binding? No, it is not. We allege specifically in the complaint that the police made false reports and that they gave false testimony, which of course was critical to a probable cause decision, tainting that decision. It is not binding. Even to the, I see that my time is up. Not yet, you may wrap up. Oh, thank you. Now it is. Now it is. I do ask that your honors reverse the district court's decision and reinstate my client's claims, none of which were waived. Thank you. Counsel? Well, the matter has been well presented, and the court will consider your arguments carefully and issue an opinion in due course. Thank you.